06-1707-cv
*Salamon v. Our Lady of Victory Hospital*

**AMENDED OPINION**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2006

(Argued:  August 2, 2007                                    Decided: January 16, 2008
                                                                         Amended: April 22, 2008)

Docket No.  06-1707-cv

————————————————————————————

DR. BARBARA E. SALAMON,

*Plaintiff-Appellant*,

– v. –

OUR LADY OF VICTORY HOSPITAL, MICHAEL C. MOORE, M.D.,
FRANKLIN ZEPLOWITZ, M.D., JOHN F. REILLY, M.D.,
ALBERT J. DIAZ-ORDAZ, M.D. and JOHN P. DAVANZO,

*Defendants-Appellees*.

————————————————————————————

Before: SOTOMAYOR and  KATZMANN, *Circuit Judges*; GERTNER, *District Judge*.[*]

————————————————————————————

Appeal from a final judgment of the United States District Court for the Western District of New York (Elfvin, J.), granting defendants summary judgment.  We VACATE the summary judgment order on the grounds that a genuine issue of material fact exists regarding the plaintiff's employment status, and we REMAND for further proceedings.

————————————

[*]       The Honorable Nancy Gertner of the United States District Court for the District of Massachusetts, sitting by designation.

For Plaintiff-Appellant:                    BARBARA E. SALAMON, West Seneca, New York, *pro se.*

                                            ANTHONY J. COSTANTINI (Eve I. Klein, Brian Damiano, Joanna R. Varon, *on the brief*), Duane Morris LLP, New York, New York, *Court-appointed Amicus Curiae to Plaintiff-Appellant.*

For Defendants-Appellees:                   RANDALL D. WHITE (Terrence M. Connors, *on the brief*), Connors & Vilardo, LLP, Buffalo, New York.

GERTNER, *District Judge*:

Plaintiff-appellant Dr. Barbara Salamon ("Salamon") sued defendants-appellees Our Lady of Victory Hospital ("OLV"), four of its doctors, Dr. Michael C. Moore ("Moore"), Dr. Franklin Zeplowitz ("Zeplowitz"), Dr. John F. Reilly ("Reilly"), Dr. Albert J. Diaz-Ordaz ("Diaz-Ordaz"), and its then-Chief Executive Officer, John P. Davanzo ("Davanzo") in the United States District Court for the Western District of New York (Elfvin, J.).[1]  Salamon claims that the defendants-appellees discriminated against her on account of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 *et seq.*  According to Salamon, beginning in May of 1996, Moore sexually harassed her by repeatedly making inappropriate comments and unwanted advances.  When she complained, Moore retaliated against her by using his powers as a hospital administrator to give her undeserved negative performance reviews, causing serious damage to

---

[1]    During the times relevant to this case, Moore was the Chief of OLV's Gastroenterology Division; Zeplowitz was OLV's Chief of Staff, Vice President of Medical Affairs, Chairman of the Medical Executive Committee and the Chief of OLV's Credentials, Quality Assurance and By-Laws Committees; Reilly was OLV's Chief of Medicine and a member of OLV's Medical Executive Committee; Diaz-Ordaz was a member of OLV's Quality Assurance Committee; and Davanzo was OLV's President/Chief Executive Officer. Memorandum and Order of March 8, 2006 ("Order") at 1 n.2.

her career prospects. The remaining defendants, Salamon alleges, were complicit in Moore's retaliatory conduct, condoning Moore's behavior and assisting him in using the hospital's "quality assurance" process to punish her for spurning — and reporting — Moore's sexual advances. In addition, Salamon claimed that the defendants were liable under Title VII for interfering with her future employment opportunities under *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973), and for tortious interference with her business relationships.

The defendants moved for summary judgment, arguing, *inter alia*, that Salamon was an independent contractor, not an employee, and therefore fell outside the ambit of the antidiscrimination statutes. *Sibley*, they contended, was not Second Circuit law, and in any case, did not apply to Salamon on the facts at bar. As to the remaining state claim, defendants urged the court to decline to exercise supplemental jurisdiction.

On March 8, 2006, the district court granted summary judgment to all defendants. With respect to Title VII and the NYHRL, the district court's decision was based on its finding that no triable issues of material fact existed regarding Salamon's employment status: Salamon, a physician with hospital staff privileges was, the court concluded, an independent contractor. Therefore, defendants' actions — even if discriminatory and retaliatory as charged — were not regulated by either statute. Further, the court found that the *Sibley* interference claim was unavailing and, since there were no surviving federal claims, it declined supplemental jurisdiction on the state tortious interference claim. *See* Order at 3-4. Salamon appeals.[2]

---

[2] Salamon proceeded *pro se* on appeal. Since significant questions were involved, we appointed amicus counsel to address the following issues: 1) Did the district court properly conclude that Salamon did not create a triable issue of material fact with regard to her status as an "employee" covered by Title VII? What facts, as opposed to legal conclusions, are in dispute? 2) Did the district court properly apply the factors set forth in *Community for Creative Non-*

Because we find that there remains a genuine issue of material fact regarding Salamon's employment status, we hold that it was error for the district court to grant summary judgment to the defendants. We VACATE the grant of summary judgment and REMAND to the district court for further proceedings on the issue of Salamon's employment status. We also VACATE the district court's decision to decline supplemental jurisdiction over the state claim of tortious interference with business relations. Finally, we AFFIRM the district court's grant of summary judgment to the defendants with respect to the plaintiff's *Sibley* claim.

## BACKGROUND

I.    *Facts*

On appeal from a grant of summary judgment, we view the facts in the light most favorable to plaintiff Salamon, the non-moving party. *See, e.g.*, *Covington v. City of New York*, 171 F.3d 117, 121 (2d Cir. 1999).

---

*Violence v. Reid*, 490 U.S. 730 (1989), taking into account any relevant case law since *Reid* was decided? Should and why should this Court apply *Reid* differently in the Title VII context than in other contexts, including, for example, the context of the Copyright Act of 1976, which *Reid* concerned? 3) Can a physician with hospital privileges be considered an "employee" for Title VII purposes, and if so, under what circumstances? Under the facts of this case, why should this Court not reach the same outcome as those reached by other courts of appeals in *Shah v. Deaconess Hospital*, 355 F.3d 496 (6th Cir. 2004); *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799 (7th Cir. 1999); *Cilecek v. Inova Health System Services*, 115 F.3d 256 (4th Cir. 1997); and *Diggs v. Harris Hospital-Methodist, Inc.*, 847 F.2d 270 (5th Cir. 1988)? 4) Should this Court recognize "interference" liability under Title VII, under which a defendant is liable for interfering with the future employment activities of a non-employee plaintiff? *See Sibley Memorial Hosp. v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973) (describing theory); *see also Gulino v. New York State Educ. Dep't*, 460 F.3d 361 (2d Cir. 2006) (discussing *Sibley*). If so, has Salamon created a triable issue of material fact that defendants have interfered with her future employment activities?

We thank the amicus counsel for participating.

A.      *Salamon's Initial Relationship with OLV*

Salamon is a board-certified gastroenterologist and internist licensed to practice medicine in New York State. In 1994, OLV approved privileges for Salamon in the "associate staff" category, which was then renamed "provisional staff." Later, she was extended full medical staff privileges. Appellant's Appendix ("App.") at 133.[3] Staff privileges at OLV were awarded for two-year terms, but subject to renewal. The reappointment process was controlled by OLV and depended largely upon the recommendations of, among others, three of the defendants: Moore, Chief of OLV's Gastroenterology ("GI") Division; Reilly, Chief of the Medical Department; and Zeplowitz, OLV's Chief of Staff. *See* App. at 442.

Salamon received the privileges and was subject to the duties of all staff physicians at OLV. Her clinical privileges extended to the use of the hospital's facilities, including access to

---

[3]     The record is somewhat inconsistent as to whether Salamon was in fact granted "active" — i.e., full — staff privileges. The plaintiff's statement of material facts states that she was promoted to active staff in late 1995, citing to Salamon's affidavit. App. at 133 (citing App. at 144); *see also* Order at 4-5 (discussing Salamon's staff privileges without differentiating between levels of staff privileges). Salamon's affidavit, however, is less than clear. She states that she was appointed in 1994 as an "associate" staff member; the name of the category was later modified to "provisional" staff. App. at 144. The OLV bylaws require that a provisional staff member must "[b]e qualified for advancement to Active Staff membership" within a year. If a provisional staff member is "not so advanced and except for good cause, [she is] subject to a reduction in Staff category or to revocation of Staff privileges." App. at 432.

However, elsewhere in her affidavit, Salamon states that her "privileges were never extended from provisional . . . to active staff, and [that she] was never reappointed biennially like other physicians at OLV." App. at 174. Furthermore, she claimed that during Davanzo and Zeplowitz's tenures on the OLV Credentials Committee, she was "never reappointed nor advanced" despite satisfying OLV's criteria. App. at 174-75; *see also* Supplemental Appendix for Defendants-Appellees ("Supp. App.") at 31 (listing Salamon as a provisional staff member as of May 1, 2002).

Whatever the label, Salamon remained at OLV for almost nine years, performing largely the same duties as an active staff member, with the same privileges. *Compare* App. at 430-31 (active staff), *with id.* at 432-33 (provisional staff).

the endoscopy equipment in the GI lab, which was vital to her practice because of the equipment's prohibitive cost and immobility. Indeed, Salamon stated that she was "wholly dependent on OLV's instrumentalities to work." App. at 178. Salamon was required to use the services of OLV nursing and support staff in her treatment of patients at OLV. Salamon was generally free to set her own hours and maintain her own patient load, subject to the availability of the endoscopy equipment, which the Hospital controlled, and to an on-call requirement discussed below. She determined which patients to see and treat, and whether or not to admit them to OLV (or another hospital). Salamon was allowed to maintain staff privileges at other hospitals, and she did so, although the "vast majority" of her practice was at OLV. *Id.* OLV did not pay her a salary, wages, benefits, or any other monetary compensation. She billed patients (or their insurers) directly for her services, while OLV billed them separately for the corresponding use of its facilities.

In turn, Salamon submitted to the policies, supervision and management of OLV in a number of ways. Like all doctors at OLV, she was required to comply with Staff Rules and Regulations and Hospital by-laws. In addition, Salamon was obliged to participate in one-hour staff meetings every three months and spend a certain amount of time "on call" for OLV. *See* App. at 179, 431, 436, 466. During this required on-call time, Salamon was obliged to treat OLV patient needs as they arose, whether or not they were her patients. This duty extended to "follow up" treatment, obligating her to continue treating a patient she had first seen while on call, even after her on-call time was over.

The most significant mechanism of supervision over Salamon was the OLV "quality assurance program,"[4] in which Salamon was required to participate as a condition of her privileges. *See* App. at 431. Under the quality assurance program, different hospital practitioners, on a rotating basis, would review procedures that had been conducted during the quarter. Cases flagged as potentially problematic would be discussed at mandatory GI division meetings. OLV also had a peer review process for further examining the practice of doctors whose cases had been flagged through the quality assurance program. Finally, OLV also reported to the National Practitioner's Data Bank ("NPDB"), a database that contains adverse information about doctors that would be queried when a doctor sought privileges at a hospital. According to Salamon, the quality assurance program included detailed requirements as to *when* and *how* her work was to be performed, requirements intended in some cases to maximize profits, not patient care. *See, e.g.*, App. at 156.

B.     *The Alleged Harassment, Retaliation and Increased Scrutiny*

Salamon alleges that her relationship with OLV changed and the level of supervision of her practice intensified after she complained of being repeatedly sexually harassed by Dr. Moore, Chief of the GI Division. According to Salamon:

> During my practice at OLV, Moore made a number of completely inappropriate and unwanted remarks to me, including, but not limited to, comments about my clothing, appearance and "attractiveness." In early 1996, Moore's comments became not merely unwanted, but

---

[4]     The record alternatively refers to "quality management" or "quality assurance." There appears to be no substantive difference in the terms; they merely refer to slightly different components of the process. OLV's bylaws provide for a "Quality Review Committee," App. at 450, of which Susan Kessler, the "Quality Management Director," App. at 207, 450, was a member. The committee oversaw the "quality assurance" process. Supp. App. at 21, 38, 41. We use the phrases interchangeably.

harassing and offensive, and consisted of unwelcome sexual advances that included the statements "Kiss me" and "I love you." Moore, using a sexually suggestive tone and manner, also called me his "favorite gastroenterologist." Additionally, Moore directed offensive behavior and body language toward me. On one occasion, Moore physically cornered me in the GI unit hallway and asked if I was "available" for him on Sunday afternoons. Moore also told me that he had "sexual fantasies" about me. Moore also repeated that he had "sexual fantasies" about me in the presence of Monica Kulik, OLV's GI lab secretary.

App. at 202-03. Kulik told Salamon that Moore had sexually harassed her as well. App. at 210.

After Salamon once again refused Moore's advances in July 1996, her relationship with OLV changed. Administrative scrutiny and intervention into her medical practice markedly increased. Her cases began to be reviewed and criticized at every staff meeting as failing to meet quality standards. App. at 203. She was regularly faulted for her refusal to perform the esophageal dilatations that she judged were not indicated and medically unnecessary. According to Salamon, the level of scrutiny exacted upon her was substantially greater than that given to any other physician in the GI Division. App. at 171. Moore, in particular, focused almost exclusively on her cases while paying far less attention to manifest complications in the cases of other physicians. *See* App. at 205.

Salamon repeatedly complained about her treatment. In August 1996, Salamon met with Albert Condino ("Condino"), then-President and CEO of OLV, preceding defendant Davanzo in this capacity, and defendant Zeplowitz, Chief of Staff, and related to them Moore's harassment. App. at 209. Condino and Zeplowitz spoke to Moore, then informed Salamon that her complaints were unfounded and that she had misperceived his comments. App. at 213. In November 1996, Salamon wrote a letter to Moore, copied to Kessler and Reilly, charging that Moore's review deliberately misrepresented her work and wrongly faulted her for refusing to

perform medically unnecessary procedures. According to Salamon, the defendants never acknowledged or responded to her complaints. App. at 205.[5]

No action was taken against Moore. Salamon, however, was another matter.

C.      *Disciplinary Action Against Salamon*

Prior to her complaint about Moore's behavior, Salamon had never received negative performance reviews. *See* App. at 581. Indeed, her reappointment profiles for 1995 and 1996 showed "no quality concerns." App. at 215. Less than a week after her meeting with Zeplowitz and Condino, however, those two, Kessler, Reilly and another doctor met and decided to examine Salamon's practice. App. at 213. They indicated their intent to re-review Salamon's cases from 1995 and the first half of 1996, despite the fact that the reports of her work during this period had already been peer-reviewed. App. at 215.

Salamon's work was then subjected to several additional levels of review,[6] notwithstanding the fact that some of the reports generated by the process indicated that her

_____

[5]      Salamon also complained about unfair treatment in the peer review process by letters of January 2, 1997, and February 20, 1997. App. at 205-06.

[6]      In turn, she was subjected to the following scrutiny: a three-physician internal review, App. at 221; an external review by an independent outside expert, Dr. Arthur Ostrov, App. at 236-37; review by a five-physician ad hoc committee, including an interview with Salamon and submission of written arguments by her, App. at 245-46; review by an outside expert paid for by OLV, Dr. David Fay, App. at 246, although the record is murky on who chose Dr. Fay; ratification of the ad hoc committee's review by an eleven-physician Medical Executive Committee following an appearance and written submissions by Salamon, App. at 250; a hearing before a five-physician hearing panel, including testimony and cross-examination by Salamon, on Salamon's appeal from the MEC's determination; App. at 253; and, at Salamon's request, further review by the OLV Board of Directors, App. at 259.

patient treatment was satisfactory.[7] In so doing, OLV contravened its usual protocols. It examined Salamon's practice in greater depth than it did for other physicians, even ones with a history of possible violations of quality assurance standards. *See* App. at 217-18.[8] Throughout, Salamon challenged the fairness of the process. When Dr. Ostrov, an independent expert, was retained to review her files, for example, she argued that his review was tainted by suggestive letters written to him by OLV and OLV's refusal to allow Ostrov to see Salamon's rebuttal. App. at 238. She also claims that a member of the ad hoc committee told her — before that committee met to evaluate Salamon's practice — that OLV was determined to reach a negative outcome in the review, regardless of the reality. App. at 249-50, 541. Other doctors in the GI Division confided in Salamon that Moore was using his personal relationships with administration members to corrupt the review proceedings. *See, e.g.*, App. at 235. Salamon's reputation suffered with the staff at OLV and other hospitals where she maintained privileges, and she stopped receiving patient referrals from other physicians at OLV.

As a result of the review, Salamon was ordered by OLV to undergo a three-month "reeducation" and mentoring program. In order to successfully "pass" the reeducation, she would have to perform consistently the indicated practices as instructed by her OLV mentor, presumably in contrast to how she had previously performed them. *See* App. at 171. Failure to complete the reeducation program would result in suspension. App. at 172. The OLV

---

[7]    Specifically, Dr. Ostrov's report "graded [Salamon's] cases as below standard," App. at 241, but Dr. Fay concluded that "'Dr. Salamon's management . . . was in no way substandard,'" and stated that he "'[saw] no issues of concern,'" App. at 247.

[8]    In particular, OLV never initiated the re-review of files of other GI physicians even when their patients suffered serious complications, such as a perforated esophagus or colon, complications which none of Salamon's patients had suffered. App. at 219-220.

administration also warned Salamon that it was possible that a negative report about her would be made to the NPDB if she did not complete the reeducation program. Ultimately, however, no physician mentor could be found to take on the responsibility of conducting the reeducation.

In June 2003, OLV merged with Mercy Hospital, another area hospital. The reeducation and mentoring requirement, along with all of Salamon's staff privileges, expired by operation of law when OLV ceased to exist as a legal entity. No report was ever made to the NPDB, but by this time the allegations of poor work quality had spread throughout the area by word of mouth. Salamon applied for work with other local employers, but received no offers.

II.     *Procedural History*

Salamon first filed a complaint with the EEOC on December 29, 1998. The EEOC dismissed the complaint, finding that she was not an employee of OLV. On January 21, 1999, she filed a complaint in the district court, claiming antitrust violations, tortious interference with business relations, Title VI violations, Title VII violations, and violation of the NYHRL.

The district court dismissed Salamon's antitrust and Title VI claims as insufficiently pled on October 5, 1999. After conducting discovery and a hearing on defendants' summary judgment motion concerning Salamon's Title VII and NYHRL claims, the court found that Salamon was not an employee of OLV and, as such, neither statute applied to her claims. On March 8, 2006, the district court granted summary judgment for defendants on those claims, rejected Salamon's additional claim under *Sibley*, and declined to exercise supplemental jurisdiction over the remaining state tortious interference claim.

Salamon challenges the district court's finding that she was an independent contractor, arguing that her relationship with defendants met the common-law definition of employment.

Alternatively, she argues under *Sibley* that defendants interfered with other potential employment relationships when their disciplinary actions effectively cut off her patient referrals. Finally, Salamon argues that the district court abused its discretion by refusing to exercise supplemental jurisdiction over her pendent state tort claim after dismissing her Title VII claim.

Defendants, conversely, urge us to affirm the district court's finding that the staff physician-hospital relationship did not meet the common-law criteria for employment. They also contend that *Sibley* was wrongly decided and that, even were we to apply it, it should not extend to interference in the doctor-patient relationship because that is not an "employment" relationship. Finally, they argue that the court's refusal to entertain supplemental jurisdiction over the state law claims was proper.

**ANALYSIS**

I.    *Applicable Law*

A.    *Standard of Review*

Summary judgment will be granted if the moving party shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). As noted above, since Salamon is the party opposing the summary judgment, we view the evidence in the light most favorable to her and draw all reasonable inferences in her favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Hemphill v. Schott*, 141 F.3d 412, 415 (2d Cir. 1998). We review *de novo* a district court's order granting summary judgment. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 224 (2d Cir. 2006). Our focus here is on whether the court properly concluded there was no genuine issue as to any material fact and the moving party was entitled to

judgment as a matter of law on its claim that Salamon was not an "employee" of OLV, as that term is used in Title VII and the NYHRL.[9]  *See Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 498-99 (2d Cir. 2001) (stating summary judgment standard).

      B.      *Law Governing the Employment Status Inquiry*

Title VII, by its terms, applies only to "employees," 42 U.S.C. § 2000e(f), but the statute defines an employee circularly as "an individual employed by an employer."  *Id*.  In *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318 (1992), the Supreme Court ruled that the definitions of "employee," "employer," and "employment" are to be determined under the common law of agency, rather than individual state law, whenever statutes failed to specifically define "employee."  *Id.* at 323.  While *Darden* addressed employment in the ERISA context, courts have adopted its reasoning to apply the common-law agency test to Title VII and other employment discrimination statutes.  *See O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997) (Title VII); *see also Scott v. Massachusetts Mut. Life Ins. Co.*, 86 N.Y.2d 429, 433-34 (1995) (NYHRL) (looking to the control test, among other factors, to determine the nature of the employment relationship).  Once a plaintiff is found to be an independent contractor and not an employee — whether on summary judgment or after a trial — the Title VII claim must fail.

Whether a hired person is an employee under the common law of agency depends on a fact-specific analysis of thirteen factors articulated by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), a case dealing with the ownership of a

---

[9]     We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims.  *See Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003); *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997).  The two will be considered together and referred to simply as "Title VII" in this decision.

copyright arising from artwork done "for hire."[10]  The "*Reid* factors," as they are called, are as

follows:

> [1] the hiring party's right to control the manner and means by which the product is accomplished[;] . . . . [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; [13] and the tax treatment of the hired party.

*Id.* at 751-52 (footnotes omitted).

Reid's list is non-exhaustive.  "Other relevant factors may also be considered so long as

they are drawn from the common law of agency that *Reid* seeks to synthesize."  *Eisenberg v.*

*Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 n.1 (2d Cir. 2000) (citation omitted).  As

to the listed factors, the court must weigh only those "that are actually indicative of agency in the

particular circumstances," *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 111 (2d

Cir. 1998), disregarding those that are either irrelevant or of indeterminate weight.  *See*

*Eisenberg*, 237 F.3d at 114.  In addition, the test "was not intended to be applied in a mechanistic

fashion."  *Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992).  In the context of anti-

---

[10]     Prior to reaching the *Reid* analysis, our precedent suggests we must find that a plaintiff has received some form of remuneration in exchange for his or her work sufficient to establish that he or she is a "hired party."  *See United States v. City of New York*, 359 F.3d 83, 92 (2d Cir. 2004).  We need not address the issue of whether the privilege of using hospital equipment, staff, and space and the mutually beneficial referral practice between OLV and staff physicians — both of which provide an indispensable financial benefit to Salamon's GI practice — constitute indirect "remuneration" because defendants treat the issue as part of, and urge us to reach, the *Reid* analysis.

discrimination cases, courts should "place special weight on the extent to which the hiring party controls the 'manner and means' by which the worker completes her assigned tasks." *Eisenberg*, 237 F.3d at 117.

II.  *Application of the* Reid *Factors*

A.  *The District Court's Findings*

The district court found that the first *Reid* factor — which measures the putative employer's right to control the "manner and means" by which the work is accomplished — weighed against Salamon because, as a physician, "she maintained professional independence with respect to diagnosing and treating her patients." Order at 13; *see also id.* at 14 ("[P]laintiff does not — nor can she — contend that defendants controlled the 'manner and means' by which she performed her GI duties on her patients."). With respect to the remaining factors, it determined that Salamon did not receive any remuneration from OLV for her work (*Reid* factors 8, 12, and 13), that she had autonomy to set her own hours and choose her own patients (factor 7), and that she was highly skilled (factor 2), all of which the court took to weigh against the existence of an employment relationship. *Id.* at 19-21. The district court further found that the source of Salamon's tools (*Reid* factor 3), the location of her work (factor 4), the right to assign additional projects (factor 6), the relationship between the work and the hospital's business (factor 10), and whether the hiring party is in business (factor 11) were all indeterminate or irrelevant. *Id.* at 19-21. Finally, the district court found that Salamon had conceded the irrelevance of the duration of the relationship (factor 5) and the hiring and payment of assistants (factor 9). *Id.* at 19. The district court concluded that the "*Reid* factors that are relevant to this

analysis all favor a finding that plaintiff was not OLV's employee under Title VII and the

NYHRL." *Id.* at 23.

In contrast to the district court, we find the record on the first and most important factor
— the "manner and means" test — contains significant contested facts, making summary
judgment inappropriate.

B.      *Application of the* Reid *Factors*

The most important factor in determining the existence of an employment relationship is

"that control or right of control by the employer which characterizes the relation of employer and

employee and differentiates the employee or servant from the independent contractor." *Metcalf

& Eddy v. Mitchell*, 269 U.S. 514, 521 (1926); *accord Eisenberg,* 237 F.3d at 114 (noting that

special emphasis should be placed on the manner and means test).  What is at issue is not merely

the right to dictate the outcome of the work, but the right to control the "manner and means" by

which the hiree accomplishes that outcome.  *Reid*, 490 U.S. at 751.[11]

The district court found this factor to weigh in favor of the defendants because Salamon,

as a physician, "had ultimate control over the GI diagnoses, services and treatment plans that she

provided to her patients . . . retained her own patients and only on occasion was obligated to treat

OLV's patients."  Order at 13.  As such, it dismissed plaintiff's allegations about the extent to

which the OLV's quality management program controlled the manner and means of Salamon's

_____

[11]      The degree of employer control is also the foundation for Title VII's limits:
Independent contractors are thought not to need Title VII protection because such contractors
already have a degree of control over their employment.  *But see* Danielle Tarantolo, Note, *From
Employment to Contract: Section 1981 and Antidiscrimination Law for the Independent
Contractor Workforce*, 116 Yale L.J. 170, 202 (2006) (challenging the claim that "independent
contractors, unlike employees, have equal bargaining power with those who hire them, and thus
do not require government intervention").

work, finding that "[a] physician's professional obligation cannot allow the hospital in which she works to dictate the diagnoses or the manner in which diagnoses are reached." *Id*. at 14.

But the court's reasoning is far too broad. It overemphasizes the role of professional judgment, contrasting it to control over the manner and means of one's work in the common law agency test and ignores the contested facts in the record. In effect, the court's reasoning would carve out all physicians, as a category, from the protections of the antidiscrimination statutes. While a physician, like any professional, must be given latitude in which to choose a course of action, especially considering the exigencies of medical practice, the mere existence *vel non* of that latitude is not dispositive of the manner-and-means test. According to the Restatement (Second) of Agency — upon which the Supreme Court relied in articulating this factor, *see Reid, 490 U.S. at 751 n.18* — the proper focus is on the relationship between the parties:

> The word ['servant'] indicates the closeness of the relation between the one giving and the one receiving the service rather than the nature of the service or the importance of the one giving it. Thus, ship captains and managers of great corporations are normally superior servants, differing only in the dignity and importance of their positions from those working under them. The rules for determining the liability of the employer for the conduct of both superior servants and the humblest employees are the same; the application differs with the extent and nature of their duties.

Restatement (Second) of Agency § 220(1) cmt. a (1958). There is nothing intrinsic to the exercise of discretion and professional judgment that prevents a person from being an employee, although it may complicate the analysis. The issue is the balance between the employee's judgment and the employer's control.

Taking Salamon's allegations as true, OLV exercised substantial control not only over the treatment outcomes of her practice, but over the details and methods of her work. Members

-17-

of the OLV administration were designated as her supervisors, with the job of "maintain[ing] continuing surveillance of [her] professional performance." App. at 442. Specifically, Salamon argues that OLV's application of its quality assurance standards constituted unwarranted and medically unsound interference with her professional practice.[12]

Salamon asserts that OLV did not merely review the quality of her patient treatment outcomes but went further, by mandating performance of certain procedures (esophageal dilation) and the timing of others (outpatient endoscopies), directing which medications she should prescribe, and recommending changes to her practice based on their financial impact to the department.

Significantly, the hospital's review of Salamon's practice did not result in the termination of her contract or a simple ultimatum to improve her patient treatment outcomes, but in a detailed "reeducation" program designed expressly to change the methods by which she arrived at diagnoses and treatment. OLV was to dictate "(a) indications and treatment for EGDs [esophagogastroduodenoscopies]; (b) appropriate treatment of AV [arteriovenous] malformations

_____

[12] The district court further stated that if it were true that OLV intruded on Salamon's treatment activities, "plaintiff would be in violation of her professional duties and obligations to her patients and, as such, is opening herself up to malpractice and negligence suits. '[A] physician, properly serving his patient . . . is not subject to external control in the exercise of his professional judgment.'" Order at 15 (citation omitted) (quoting *Wood v. United States*, 494 F.Supp. 792, 798-799 (E.D.Va.1980) (alterations in original)). But issues of potential liability to third parties do not change whether the defendants did, in fact, exercise heightened control over the manner and means by which Salamon performed her job, as she alleges.

Nor is it true that the practice of medicine brooks no "external control," as the district court's findings suggest. Supervisors, especially those who are themselves physicians, may be able ethically to require their supervisees to make risk calculations more conservatively than professional standards or the physician's own judgment would call for (for example, by liberally performing confirmatory tests). Indeed, some of the impositions alleged by Salamon here fall into that category.

and removal of polyps found on colonoscopy; (c) use of ph monitoring with esophageal manometry[;] and (d) length of colonoscopy procedures and level of sedation during colonoscopy." App. at 171. "Appropriate treatment," "removal," "monitoring," "length of . . . procedures," and "level of sedation" are exactly the kinds of "manner and means" of practice over which employers exert control. That this reeducation ultimately did not occur is beside the point. What is relevant to the *Reid* analysis is that this level of review was clearly contemplated and present in the Salamon-OLV relationship.

As the district court noted, hospital policies that merely reflect professional and governmental regulatory standards may not typically impose the kind of control that marks an employment relationship. *See Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 262 (4th Cir. 1997). But while the defendants describe their standards as being "mandated by state and federal statutes and regulations," Supp. App. at 21 (citing Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101-11152; N.Y. Pub. Health Law art. 28; N.Y. Comp. Codes R. & Regs. tit. 10, § 405), those statutes do not dictate the detailed treatment requirements OLV instituted. They concern health care administration, record keeping, financing, liability, patients' rights, and the delegation of responsibilities.[13] To the extent motive is relevant to the "manner and means" analysis — an issue upon which we express no opinion here[14] — Salamon has adduced evidence

---

[13]    The state rules and regulations come closest to governing aspects of everyday medical practice, but even they do not approach the level of performance detail dictated by OLV. For example, N.Y. Comp. Codes R. & Regs. tit. 10, § 405.16(c)(2) states only that "[t]he laboratory director shall . . . assure that all tests, examinations and procedures are properly performed, recorded and reported." It does not specify what constitutes "proper[] perform[ance]."

[14]    The inquiry under *Reid* into the degree of control the employer exercises over the manner and means of a putative employee's conduct is not a search for motive. While the

that some of the practices pressed on her by the hospital were not motivated by concern over compliance with external statutes and regulations, but aimed at punishing her for complaining about Moore's harassment.

The alleged control exerted over Salamon's practice by her supervisors was not intermittent. The review was continuous, not merely for negative medical outcomes, but for "variations" from the recommended procedures. App. at 152. Indeed, Salamon claims that the standards were imposed so closely on her that nearly every one of her cases was scrutinized in every GI staff meeting from July 1996 onward. In short, whether the methods that the hospital required of Salamon merely reflect professional standards or demonstrate a greater degree of control sufficient to establish an employee-employer relationship is a factual issue that is not resolved by the current record.

We are aware that other courts of appeals have found that hospital peer review programs do not constitute exercises of control over the manner and means of physician practice. *See Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004); *Cilecek*, 115 F.3d at 262; *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996); *Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 273 (5th Cir. 1988). The test in this Circuit is no different from that of other circuits. But, as noted above, the analysis of any employment relationship is fact-specific. Those courts, too, recognized that each case requires scrutiny of the relationship at bar; staff privileges, standing alone, do not decide employment status. *See Shah*, 355 F.3d at 499-500 (analyzing the

employer's motives in implementing controls and standards may be relevant to the question of how they operate in fact, they do not bear directly on the *Reid* analysis.

particular relationship at issue in that case); *Cilecek*, 115 F.3d at 260-61 (same); *Alexander*, 101 F.3d at 493 (same); *Diggs*, 847 F.2d at 272-73 (same).

If Salamon's allegations are true, as we must assume at this stage of the proceedings, a reasonable fact-finder could conclude that OLV's quality assurance program exceeded the control exerted in the cases cited above, particularly as evidenced by what occurred after the alleged instances of harassment. In *Shah*, for instance, the court noted that "[n]othing in the record suggests that [the hospital] has the right to interfere with Shah's medical discretion or otherwise control the manner and means of his performance as a surgeon." 355 F.3d at 500. The plaintiff in *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799 (7th Cir. 1999), could not "point to any specific evidence that would substantiate her claim that [the hospital] exercised close control or call into question the express statement in the [employment] agreement [that she was an independent contractor]." *Id.* at 806. And in *Diggs*, the court found that the plaintiff was a "provisional staff member" and was "required to have a sponsor present during surgical procedures, but the purpose of that requirement was to have someone to attest to her essential qualifications, not to direct the details of the exercise of her skill." 847 F.2d at 273.

Here, as described above, a reasonable fact-finder could conclude from the present record that the quality assurance standards extended beyond mere health and safety concerns or ensuring Salamon's qualifications. In addition, Salamon claims, with record support, that if she did not comply with these standards, she faced the possibility of negative peer reviews, *see* App. at 168, and an extensive remedial program that was meant to dictate particular details of her medical practice, *see* App. at 171. *Cf. Shah*, 355 F.3d at 500 (standards were applied to physicians only after the fact, as opposed to prospective reeducation requirement here).

On remand, the district court, reweighing all of the *Reid* factors, rather than focusing on the 'control factor' with which this appeal was concerned, may determine that summary judgment is appropriate or that the case should be tried on all issues.[15] While summary judgment may be appropriate in some cases concerning staff physicians suing hospitals, it is not appropriate in all. We conclude that, viewing the circumstances of this particular case in the light most favorable to the plaintiff, the non-moving party, Salamon has demonstrated a genuine factual conflict regarding the degree of control OLV exercised over her. Summary judgment must therefore be reversed and the case remanded to the district court for further proceedings.

III.     *Salamon's* Sibley *Claim*

Salamon also alleges that even if she did not have an employment relationship with defendants, they interfered with her potential employment relationships by ceasing to refer

_____

[15]     The question of whether the employee/independent contractor finding should ultimately be made by a jury or by the court was not briefed or argued before us, and it should be considered by the district court in the first instance. *Compare Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 170-71 (2d Cir. 1998) (expressing uncertainty as to whether the matter is a question for the jury or the judge), *with Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (noting that hostile work environment claims are "'mixed question[s] of law and fact' that are 'especially well-suited for jury determination'" (quoting *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)). *See also Garcia v. Copenhaver, Bell & Assoc., M.D.'s, P.A.*, 104 F.3d 1256, 1263 (11th Cir. 1997) ("[T]he ultimate conclusion reached by our holding that whether or not one is an 'employer' is an element of a[] [discrimination] claim, is the belief that the jury, rather than the judge, should decide the disputed question."); *Herr v. Heiman*, 75 F.3d 1509, 1513 (10th Cir. 1996) (noting, in ERISA context, that "[w]hether an individual is an employee or an independent contractor is generally a question of fact for the jury to decide"); *Worth v. Tyer*, 276 F.3d 249, 263-64 (7th Cir. 2001) (holding, in Title VII context, that "there was sufficient evidence for the jury to conclude that Worth was an employee"). *But see Schwieger v. Farm Bureau Ins. Co. of Nebraska*, 207 F.3d 480, 484-85 (8th Cir. 2000) (appearing to assume that the question is a threshold matter for the court to decide).

patients to her.[16]  She relies on *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir

1973), in which the D.C. Circuit held that, because the purpose of Title VII is to "achieve

equality of employment opportunities," a party can violate Title VII by acting so as to interfere

with "access to the job market" even if that party is not an employer.  *Id*. at 1340-41 (internal

quotation marks and emphasis omitted).

In *Sibley*, defendant Sibley Hospital mediated between duty nurses and patients, taking

patient requests and referring nurses accordingly.  Plaintiff Wilson, a male nurse, was a member

of Sibley's registry.  *Id.* at 1339.  When Wilson's name came up for a female patient, Sibley

would allegedly reject him in favor of a female nurse, even though the female patients had not

requested female nurses.  *Id.* at 1340.  Similarly, in this case, Salamon argues that OLV acted as

an intermediary between Salamon and her potential patients.  She argues that OLV violated her

Title VII rights under *Sibley* by allegedly interfering with her access to patients after she

complained of sexual harassment, as well as interfering with her employment opportunities at

other hospitals.[17]  The district court rejected the *Sibley* claim because it concluded, as a matter of

law, that a plaintiff's relationship with her patients is not an employee–employer relationship.

---

[16]     This claim is distinct from her state tortious interference claim, the merits of which are not at issue on appeal.

[17]     Salamon also argues that the fallout from the defendants' actions damaged her relationships with other hospitals, relationships which were potential employment opportunities. The district court held that the plaintiff did not "allege an injury-in-fact." Order at 26. The degree to which the plaintiff contests this on appeal is unclear. *See* Pl. Br. at 32. Because that issue is not substantially addressed by either party, we do not reach it on this appeal. We do note, however, that the same conduct may be substantially covered by Salamon's surviving pendent claim of tortious interference with business relationships.

Several months after the district court issued its opinion, this Court considered whether to recognize a *Sibley* interference claim under Title VII in *Gulino v. New York State Education Department*, 460 F.3d 361 (2d Cir. 2006). The court disagreed with *Sibley*'s "expansive approach to interpreting the straightforward language of the statute," and it held that "this Circuit has never adopted a broad reading of the *Sibley* interference test, and we decline to do so now." *Id.* at 374. We need not decide in this case whether *Gulino* closed the door entirely on the *Sibley* theory of interference liability in this Circuit, because the district court correctly concluded that Salamon has not established that her relationship with potential patients would constitute an employee-employer relationship. *See Diggs*, 847 F.2d at 274 (noting that "patients d[o] not control the manner and means of [the doctor's] professional treatment"); *Alexander*, 101 F.3d at 493 n.2 (observing that a physician is "not an employee of his patients, just as an insurance agent or limousine driver is not an employee of her customers"); *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 190 (4th Cir. 1998) ("A patient is a doctor's customer, not his employer."). Accordingly, we affirm the district court's grant of summary judgment on the *Sibley* claim.

IV.     *Salamon's Pendent State Claims*

Salamon further argues that the district court abused its discretion when it declined to exercise supplemental jurisdiction over her state claims of tortious interference with business relationships after dismissing her federal claim. Since we reverse the grant of summary judgment that disposed of Salamon's federal claims, we vacate the grant of summary judgment on this issue.

**CONCLUSION**

For the foregoing reasons, we **VACATE** the grant of summary judgment to defendant-appellees, and **REMAND** for further proceedings on Salamon's Title VII and NYHRL claims.