06-3139-cr
*United States of America v. Connolly*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Submitted: June 18, 2008                    Decided: December 4, 2008)

Docket No. 06-3139-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ODELL CONNOLLY,

*Defendant-Appellant,*

_____

B e f o r e :

STRAUB, RAGGI, *Circuit Judges*, SESSIONS,[*] *District Judge*

_____

Defendant-Appellant Odell Connolly was found guilty of illegal reentry into the United States as a convicted felon in violation of 8 U.S.C. § 1326(b)(2).  Connolly argued that the charge must be vacated because he had established the requisite showing for United States citizenship under 8 U.S.C. § 1403 based on the fact that his biological father was a United States citizen and a member of the Army Reserves at the time of Connolly's birth in Panama.  The panel holds that an inactive reservist is not "employed by the United States government" for

_____

[*] The Honorable William K. Sessions III, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

purposes of 8 U.S.C. § 1403 under the plain meaning of the statutory language.  Thus, even assuming that Brewer fell within the definition of "father" under § 1403, the panel concludes that Connolly cannot establish that he is a United States citizen under the statute.

_____

DANIEL NOBEL, New York, New York

JOHN A. NATHANSON, Assistant United States Attorney (Benton J. Campbell, United States Attorney and Emily Berger, Assistant United States Attorney, for the Eastern District of New York, *on the brief*), Brooklyn, New York

_____

SESSIONS, *District Judge*:

Defendant-Appellant Odell Connolly appeals from the judgment of the District Court for the Eastern District of New York (Sandra L. Townes, *Judge*) entered on June 20, 2006, finding him guilty of illegal reentry into the United States as an alien convicted of an aggravated felony in violation of 8 U.S.C. § 1326(b)(2).  Connolly argues on appeal, as he did before the District Court, that the judgment must be vacated because he is a United States citizen under 8 U.S.C. § 1403.  The District Court concluded that § 1403 does not confer citizenship upon Connolly for two reasons.  First, it held that Larry Brewer, Connolly's biological father, did not qualify as Connolly's father for the purposes of § 1403.  Second, it held that Brewer was not employed by the United States government at the time of Connolly's birth.  We affirm the judgment of the District Court solely on the latter ground.

**BACKGROUND**

The parties stipulated to the following relevant facts at the proceedings before the District Court.  Connolly was born in Panama on April 21, 1968.  His mother, Norma Connolly, was at the time a Panamanian citizen, but his father, Larry Brewer, was a United States citizen.  Brewer was drafted into the United States Army Reserves on April 29, 1966, and, after a period of

2

training, posted to the 577th Artillery Brigade and stationed at Fort Sherman in the Panama Canal Zone. Brewer remained in Panama on active duty until April 3, 1968. While in Panama, Brewer and Norma Connolly had a relationship which culminated in Norma Connolly's pregnancy. Connolly's paternity is uncontested; indeed, Brewer submitted a sworn affidavit to the District Court acknowledging that his paternity of Connolly. Brewer and Norma Connolly were never married. On April 3, 1968, Brewer was separated from active duty, transferred into the Ready Reserves, and assigned to a command in St. Louis, Missouri. Eighteen days later, Odell Connolly was born.

From April 1968 through June 1970, while Brewer was still a member of the reserves, the Army neither ordered nor asked him to perform any duties or services. Brewer did not receive any pay nor any other form of compensation from the Army or any other agency or unit of the United States government. The Army maintained the authority to recall Brewer to active duty; however, this authority was not exercised. Upon his return to Illinois in 1968, Brewer resumed his prior employment with the Ford Motor Company full-time. In June 1970, Brewer transferred voluntarily to the 425th Transportation Command in Forest Park, Illinois, and for the four months that he was there, he participated in periodic drills and training. In October 1970, Brewer transferred back to the St. Louis command; in April 1971, he was transferred to the Army Standby Reserves; and in April 1972, Brewer was discharged from military service.

Connolly legally entered the United States in 1993. He was arrested on January 24, 1995, and pled guilty to a drug-related felony on December 6, 1995. The Immigration and Naturalization Service ("INS") thereafter placed Connolly in deportation proceedings, and he was ultimately deported in December 1998. At no point during the deportation proceedings did

Connolly assert his claim of United States citizenship. Connolly most recently reentered the

United States sometime after January 2002. He subsequently gained employment, first as a

medical assistant and then as an emergency medical technician. After a routine check, the

Department of Homeland Security[1] discovered that Connolly appeared to be residing in the

United States and arranged for his arrest on April 28, 2005.

## DISCUSSION

Connolly maintains that he is and has been a United States citizen since birth by force of

8 U.S.C. § 1403, a rarely adjudicated provision of immigration and nationality law. Section 1403

prescribes the following:

> Any person born in the Republic of Panama on or after February 26, 1904, and whether before or after the effective date of this chapter, whose father or mother or both at the time of the birth of such person was or is a citizen of the United States employed by the Government of the United States or by the Panama Railroad Company, or its successor in title, is declared to be a citizen of the United States.

8 U.S.C. § 1403(b). The application of this provision to the specific facts of this case raises two

exegetic questions regarding the definitions of "father" and "employed." We review the District

Court's determination regarding the statute's definitions of "father" and "employed by the United

States" de novo, because they are matters "of statutory interpretation." *Boykin v. KeyCorp*, 521

F.3d 202, 207 (2d Cir. 2008).

The first question is whether the term "father" as used in § 1403 refers simply to a male

parent and therefore includes the biological father of a child born out of wedlock. The

[1] The INS was abolished effective March 1, 2003, and its functions were split between three bureaus in the Department of Homeland Security. The majority of the INS's enforcement functions were transferred to the Bureau of Immigration and Customs Enforcement. *See* Homeland Security Act of 2002, Pub.L. No. 107-296, § 471, 116 Stat. 2135, 2178 (codified as amended at 6 U.S.C. § 291).

4

government has proposed a more narrow and complex definition. Relying on an interpretation letter apparently issued by the INS, Interpretation 303.1, the government argues that "father" as used in this section must be read to exclude the father of a child born out of wedlock "unless the child is legitimated in accordance with the law of the father's domicile." INS Interpretation Letter 303.1, 2001 WL 1333855 (2001). The District Court concluded that Interpretation 303.1 was entitled to *Chevron* deference, despite the scant information available about the document itself.[2] *United States v. Connolly*, No. 05-cr-428, 2006 U.S. Dist. LEXIS 22956, at *10 (E.D.N.Y. Apr. 25, 2006). However, there are a number of reasons to question this conclusion.

*Chevron* requires that courts undertake a two-step inquiry when reviewing an agency's construction of a statute that comes within its purview. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* Only "if the statute is silent or ambiguous

---

[2] Aside from its title, this document provides very little information about its genesis or identity. While relying on it, the District Court provided no further information about what this interpretation is, where it came from, where it is published, or when it was written. The government provided a Westlaw cite for the document: 2001 WL 133855. On Westlaw, the document is entitled: "United States Department of Justice, Immigration & Naturalization Service Interpretation Letter: Interpretation 303.1." Other than the 2001 date given to it by Westlaw, the letter does not contain a date or any other publication information that would help to identify how it came to exist. "Statutory interpretations contained in [agency] opinion letters, as opposed to those arrived at after formal agency adjudication or notice-and-comment rulemaking, are not binding authority, and do not command *Chevron* deference." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 149 (2d Cir. 2008) (citations omitted) (noting that "[n]evertheless, such agency letters represent 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'") (quoting *Gualandi v. Adams*, 385 F.3d 236, 243 (2d Cir. 2004)).

with respect to the specific issue," should the reviewing court reach the second question, namely, "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843; *see also Puello v. BCIS*, 511 F.3d 324, 327 (2d Cir. 2007) ("Well-established principles of construction dictate that statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there."). Moreover, an "administrative implementation of a particular statutory provision qualifies for *Chevron* deference [only] when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp*, 533 U.S. 218, 226-27 (2001).

In this case, it is unclear whether the District Court addressed the first step of the inquiry. Indeed, there appears to be little ambiguity in the language of § 1403. The statute uses the term "father" without modification, restriction or exception. INS Interpretation 303.1 itself observed that the precursor statute to § 1403 "makes no distinction between persons born in or out of wedlock." INS Interpretation Letter 303.1, 2001 WL 1333855. Nor is such a distinction drawn anywhere in the legislative history.

In determining whether Congress has spoken clearly and directly to a question at issue, we recently observed "that 'statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 305 (2d Cir. 2007) (en banc) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). "'[W]e begin with the understanding that Congress says in a statute what it means and means in a statute what it says there.'" *Id.* (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,

530 U.S. 1, 6 (2000)). In this case, the ordinary meaning of "father" is a male parent,[3] and it is the duty of the court to enforce the plain statutory language. *See Hartford Underwriters Ins. Co.*, 530 U.S. at 6.

Furthermore, the absence of language distinguishing children born out of wedlock does not permit an inference of ambiguity in this case. Consideration of the broader statutory framework makes this clear. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. . . . A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme." (citation and internal quotation marks omitted)). Where Congress has wished to distinguish fathers of children born out of wedlock in Title 8, it has not shied away from express language to that effect. For purposes of subchapters I and II, of Chapter 12, Title 8, Congress has expressly excluded fathers of children born out of wedlock from the definition of "parent," "if the father has disappeared or abandoned or deserted the child or if the father has in writing irrevocably released the child for emigration and adoption." 8 U.S.C. § 1101(b)(2). However, with regard to subchapter III (which contains § 1403), Congress specifically established a much broader definition of "father." *See* 8 U.S.C. § 1101(c)(2) (providing that father as used in subchapter III includes the deceased father of a posthumous child). Even within subchapter III, where Congress has intended to modify the definition of "father" it has done so expressly, not by

---

[3] The *Oxford English Dictionary* defines "father" as "[o]ne by whom a child is or has been begotten, a male parent, the nearest male ancestor." The lengthy historical *Oxford English Dictionary* definition never once ties the word "father" to legitimacy. *Oxford English Dictionary* (2d ed. 1989).

implication. *See* 8 U.S.C. § 1409(a) (imposing additional requirements for grant of citizenship to children born out of wedlock pursuant to select provisions of §§ 1401 and 1408). The government argues that the absence of language excluding fathers of children born out of wedlock must be read as a tacit endorsement of "the rule that an illegitimate child does not acquire citizenship through a citizen father unless the child is legitimated in accordance with the laws of the father's domicile." *Connolly*, 2006 U.S. Dist. LEXIS 22956, at *10. We are persuaded that the intricate legislative scheme summarized above belies such an interpretation.

Even if § 1403 were ambiguous, the interpretation advanced by the government would raise a number of difficulties. In particular, it is unclear what level of deference Interpretation 303.1 merits in light of *Mead Corp.*, 533 U.S. at 227-28, 232, and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."). There are, at the very least, significant questions regarding the thoroughness and validity of the reasoning embraced in Interpretation 303.1 as well as its consistency with later pronouncements.

First, the sources upon which Interpretation 303.1 relies for its asserted rule are of limited relevance. Interpretation 303.1 specifically relies on a number of pre-1940 statements issued by the Department of Justice. *See* INS Interpretation Letter 303.1, n.9, 2001 WL 1333855 (citing 39 Op. Atty. Gen. 290 (1939); 39 Op. Atty. Gen. 556 (1937); 32 Op. Atty. Gen. 162 (1920)). These opinions were adopted by the Department of Justice in reference to a distinct provision of immigration law, namely section 1993 of the Revised Statutes of the United States (1878), as

8

amended by the Act of May 24, 1934, Pub. L. No. 73-250, § 1, 48 Stat. 797 (1934). Not only was section 1993 a much broader provision than the provision at issue in this case, but, at the time, Congress had not addressed the issue of whether a child born out of wedlock could qualify for derivative citizenship. *See de los Santos v. INS*, 525 F. Supp. 655, 666-67 (S.D.N.Y. 1981) ("The first provisions in the United States nationality laws that dealt with illegitimate children were enacted as part of the Nationality Act of 1940.") In fact, Attorney General Murphy in the 1939 opinion cited by the INS, regarding whether "foreign-born illegitimate children of American mothers may be regarded as American citizens," where he notes that the applicable statutory regulations do not apply to children born out of wedlock, also writes "that resort to Congress for additional legislation is desirable."[4] As detailed above, Congress has since 1940 expressly addressed the issue of children born out of wedlock.

In addition, a more recent pronouncement issued by the Department of Justice addresses Interpretation 303.1 and arrives at the contrary conclusion. *See* Genco Op. No. 91-30, 1991 WL 1185141 (1991). In this opinion, the General Counsel's Office of the Department of Justice notes that under the 1946 Panamanian constitution, "all children are deemed to be legitimate from birth." *Id.* Therefore, in order to establish citizenship under § 1403, the opinion concludes that a person need only establish the parentage requirements and that no proof of legitimation is required. *Id.*

However, we conclude that we need not, and thus do not, here decide whether any deference is owed under *Chevron* and the related case law to the narrow, complex, and arguably

---

[4] Attorney General Murphy also notes that *Ng Suey Hi v. Weedin*, 21 F.2d 801 (9th Cir. 1927), a case cited by Interpretation 303.1, actually questioned the validity of the rule proposed by the agency. 39 Op. Atty. Gen. 290; *see also de los Santos*, 525 F. Supp. at 666.

archaic definition of "father" proposed by the government in this case.[5] Connolly's petition must be denied regardless, because, as the District Court observed, he cannot establish that his father was "employed by the Government of the United States" at the time of his birth for purposes of § 1403.

Although Brewer was separated from active duty eighteen days before Connolly was born, Connolly argues that Brewer remained employed by the government based on his transfer to the Ready Reserves. Congress has not provided a definition of "employed" for purposes of § 1403 nor for any related immigration or nationality provisions.[6] In the absence of any express definition, we find that Brewer was not "employed by the Government of the United States" at the time of Connolly's birth under the plain meaning of the statute. 8 U.S.C. § 1403(b); *see Hartford Underwriters Ins. Co.*,.530 U.S. at 6. The term "employ" commonly means "to use or engage the services of" or "to provide with a job that pays wages or a salary." *Merriam-Webster's Collegiate Dictionary* 378 (10th ed. 2000). The Supreme Court has also explained

---

[5] There is still another reason for proceeding with caution: were we to find that Congress intended § 1403 to apply only to legitimate children or children legitimated in accordance with the laws of the father's domicile, such a rule could potentially implicate a serious constitutional question. *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 70-71 (2001) (finding that the imposition of an extra but "minimal" burden in 8 U.S.C. § 1409(a)(4) on a father who seeks to confer citizenship on his child born out of wedlock was not unconstitutional because the law serves an important governmental interest, and the means are substantially related to the ends; noting that "[o]nly the least onerous of the three options provided for in § 1409(a)(4) must be satisfied").

[6] In Title 5, the United States Code provides that a "Reserve of the armed forces who is not on active duty . . . is deemed not an employee . . . [of] the United States." 5 U.S.C. § 2105(d). Although this provision was passed for a distinctly different purpose, it lends credence to the government's argument that Congress "employed" in § 1403 requires more of a relationship than the one Brewer had. *Cf. United States v. Dillard*, 214 F.3d 88, 103 n.17 (2d Cir. 2000) (explaining that statutes and rules created in different contexts and for different purposes may have different meanings, notwithstanding the use of similar words).

10

that where Congress has not provided a helpful definition for "employee," we should assume Congress had in mind "the conventional master-servant relationship as understood by common-law agency doctrine." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992) (noting that when Congress has not provided a helpful definition for "employee," we should assume Congress had in mind "the conventional master-servant relationship as understood by common-law agency doctrine"); *accord Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008). Under this doctrine, "[w]hether a hired person is an employee under the common law of agency depends on a fact-specific analysis of thirteen factors." *Salamon*, 514 F.3d at 226. Those factors are:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. No one of these factors is determinative.

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989) (citations omitted).

We find that after Brewer was separated from active duty and at the time Connolly was born, Brewer's services were not engaged by the government. On the one hand, a few of the factors that we examine to determine if a master-servant relationship existed support Brewer: To be a member of the United States Army, even as a member of the reserves, Brewer had to have certain skills which he gained through training by the Army. In addition, the United States Army Reserves had control over the duration of Brewer's time as a reservist. Moreover, the government could call him up to active duty or require him to attend training -- and this use would have been part of the regular business of the Army.

11

However, the factors tending to show that Brewer was not "employed" for purposes of the statute far outweigh these considerations. Most importantly, after transferring to inactive duty, Brewer left Panama and returned to the job he had prior to being drafted. Until June 1970, Brewer did not participate in training, he was not paid a salary, nor did he receive any other compensation during that time. Brewer did not require any "instrumentalities and tools," *see id.* at 751, to complete his duties, because he had no duties. Nothing in the statute governing reserves provides that the Army Reserves could dictate what employment Brewer took up after being separated from active duty or where he could live. In sum, the Army Reserves had the right to "engage" Brewer's services, but it did not do so. Needless to say, both the Reserves and reservists serve a necessary and valuable purpose, *see* 10 U.S.C. § 10102; however, this fact, in and of itself, is not sufficient to constitute an employment relationship under the ordinary meaning of the statutory language.

For the foregoing reasons, Connolly's conviction for illegal reentry in violation of 8 U.S.C. § 1326(b)(2) is AFFIRMED.